IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Doral Steel, Inc., | Case No. 3:09 CV 996 |
|               Plaintiff, | MEMORANDUM OPINION AND ORDER |
|     -vs- | JUDGE JACK ZOUHARY |
| Gray Metal Products, Inc., | |
|               Defendant. | |

## INTRODUCTION

The issue before the Court is the amount of damages arising out of an admitted breach of contract for the sale of steel (Doc. No. 29 ¶ 1). The Court held an evidentiary hearing on September 3, 2009 (Doc. No. 22). Both parties submitted pre-hearing and post-hearing Memoranda (Doc. Nos. 18-19, 26-27).

## FINDINGS OF FACT

On July 1, 2008, Defendant Gray Metal Products ("Gray") submitted to Plaintiff Doral Steel, Inc. ("Doral") a Purchase Order for hot dip galvanized steel of various widths and gauges (Ex. A). The purchase order called for 875 metric tons of steel to be delivered at the "end of July 2008" for a total purchase price of $1.24 million. On July 29, 2008, Richard Gray (Purchasing Manager for Gray) sent an email to John Spoerl (Sales Rep for Doral) asking Doral to "move a couple hundred tons of steel to another customer," presumably because it was not needed (Ex. P). Spoerl refused to reduce the tons from Gray's order, but did agree to "work a little longer on the time frame and spread [the shipments] out in August" (Ex. P). Starting in August 2008, Gray issued a number of partial releases

on the July Purchase Order authorizing Doral to ship some of the steel (Tr. 27). Gray accepted and paid for all shipments of this released steel (Tr. 25-26).

On August 8, 2008, Richard Gray sent another email to Spoerl stating "you are going to need to work with us on this, or we will be forced to cancel some of the tonnage" (Ex. P). During this time, the price of steel was declining dramatically (Tr. 33). One month later, Gray placed an order for steel with a different vendor; this order was substantially the same as Gray's previous order from Doral (Ex. CC; Tr. 96-97). Conversely, on September 26, 2008, Doral shipped to another customer coils of steel originally designated for Gray (Ex. X; Tr. 41-42).

On September 30, 2008, Richard Gray sent another email to Spoerl stating that Gray "will not be able to take any more of this material unless the pricing is adjusted drastically" (Ex. R; Tr. 30). Spoerl replied that Doral might be able to adjust the pricing if Gray were willing to take more tons than specified in the July Purchase Order (Ex. S; Tr. 30-31). However, the parties never reached an agreement to modify the price or quantity (Tr. 36-37).

Richard Gray sent another email to Spoerl on October 22, 2008 (Ex. R):

John, after reviewing the new proposal from you and looking at what we have in inventory along with the price of steel in the low .50 a pound range we can not bring in anymore material from Doral. I am sorry but this is the position we have to take to protect our companies. If the pricing was closer to current market conditions we would be able to probably do something but with the current drop we are being forced to adjust our pricing in several markets.

Gray did not issue any more releases and refused to accept any more steel after October 2008 (Tr. 40, 101). There was no further contact between Doral and Gray until February 2009 (Tr. 100-01).

In early February 2009, Mike Crooks (Vice President of Doral) called Richard Gray who confirmed he would not take any more steel (Tr. 49-50). On February 17, Doral's legal counsel sent Gray a letter demanding reasonable assurance that Gray would accept and pay for the remaining steel

2

under the July Purchase Order (Ex. 12; Tr. 113-14). Gray did not respond to the letter (Tr. 113-14) and this lawsuit followed on April 1 (Doc. No. 1). Doral's legal counsel sent Gray a notice of private sale on May 26, indicating that Doral had an opportunity to sell most or all of the .012 gauge steel that Gray had refused to accept (Ex. T), but that private sale fell through. Doral eventually sold some of the steel but never gave Gray notice of those sales (Ex. Y).

The parties agree on the type and quantity of steel that Gray refused to accept (Ex. Y; Doc. No. 26, p. 9; Doc. No. 27, p. 2):

| Gauge | Quantity (pounds) | Purchase Order Price ($/lb) |
|---|---|---|
| .012 x 48 | 264,554.7 | 0.6695 |
| .012 x 41.25 | 661,368.8 | 0.6695 |
| .016 x 48 | 244,933.6 | 0.6395 |
| .016 x 60 | 99,208.0 | 0.7195 |
| .019 x 60 | 440,924.5 | 0.6795 |

**CONCLUSIONS OF LAW**

This dispute is governed by the Ohio Uniform Commercial Code ("UCC") and, specifically, the application of the UCC damages provisions. This Court must determine (1) when did Gray cancel (or repudiate) the contract, and (2) what is the appropriate measure of damages based on that cancellation date. Doral argues that Gray did not unequivocally cancel the contract until March 2009, when it failed to answer Doral's written demand for adequate assurance of performance. Gray argues the contract was cancelled earlier in September, or at the latest October, by virtue of Richard Gray's email exchanges with Spoerl, when Gray refused to accept any more shipments of steel.

**Time of Cancellation**

To cancel a contract, there must be a clear expression of intent not to perform. Anticipatory repudiation "centers upon an overt communication of intention or an action which renders

3

performance impossible or demonstrates a clear determination not to continue with performance." R.C. § 1302.68, Comment 1 (UCC § 2- 708); *see also Am. Bronze Corp. v. Streamway Prods.*, 8 Ohio App. 3d 223, 228 (1982) (anticipatory repudiation "must be a definite and unequivocal refusal to perform").

Based on a combination of Gray's statements and actions, this Court concludes that Gray unequivocally cancelled the contract in mid-November 2008. Richard Gray's email to Spoerl on October 22, 2008 is strong evidence that Gray did not intend to accept any more steel from Doral:

> After reviewing the new proposal from you and looking at what we have in inventory along with the price of steel in the low .50 a pound range **we can not bring in anymore material from Doral. I am sorry but this is the position we have to take to protect our companies.** If the pricing was closer to current market conditions we would be able to probably do something but with the current drop we are being forced to adjust our pricing in several markets.

(Ex. R) (emphasis added). Doral argues this email is not a cancellation because the email suggests Gray could "probably do something" if Doral dropped its price. But one month earlier, Doral had offered to reduce the price slightly -- though nowhere near "current market" value -- *if* Gray agreed to take more steel. Gray declined, choosing instead to cancel the remaining steel. Given this series of communications, the last sentence of the October 22 email is not a counter-offer. Rather, it is a confirmation of its earlier desire to cancel and a repeated explanation of why Doral would not "bring in anymore material from Doral." And even if a counter-offer, Doral never took steps to negotiate, let alone accept, lower pricing.

While Gray's *communications* showed a clear intent to cancel, its *past actions* did suggest some flexibility in its position. Gray had threatened to cancel as early as August 8, 2008, yet it kept releasing shipments into October. Thus, for more than two months, Gray was sending "distress signals" about its intent to follow through on the contract. But by the end of October, Doral could no

4

longer have reasonable doubts about the sincerity of Gray's cancellation, especially with the clear language of the October 22 email and Gray releasing no further shipments after that date (Tr. 40, 101). Gray's silence corroborated and confirmed the refusal expressed in the October 22 email.

This Court therefore concludes that the October 22 email, coupled with the halt in releasing shipments, meant that Gray unequivocally cancelled the contract by the end of October 2008. This conclusion is supported by the lack of any communication between Doral and Gray between October 2008 and February 2009 (Tr. 100-01). Doral had clearly given up trying to coax Gray into accepting the balance of the steel.

Doral argues it was entitled to demand adequate assurance of performance under Revised Code § 1302.67, which it did in its February 17, 2009 letter to Gray.[1] The contract was not repudiated, contends Doral, until thirty days elapsed after its demand and Gray failed to respond. Doral's contention is unpersuasive for two reasons. First, Section 1302.67(D) is merely one method by which a contract can be repudiated; nothing in that section prevents a party from otherwise communicating an unequivocal refusal to perform. *Cf. Markowitz Co. v. Toledo Metropolitan*

---

[1]

Revised Code § 1302.67 (UCC § 2-609) provides in part:

    (A) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

    (B) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.
    * * *

    (D) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

*Housing Authority*, 608 F.2d 699, 705 (6th Cir. 1979) (contemplating that a party's statements may have repudiated a contract even before the other party demanded adequate assurance of performance). As explained above, Gray had clearly cancelled the contract by the end of October.

Second, it was not reasonable for Doral to wait until February 2009 to demand assurance. Doral had "reasonable grounds for insecurity" about Gray's commitment to perform as far back as September 2008, when Gray threatened to cancel the remaining steel unless Doral dramatically reduced its price. *See Donray Prods. v. Maxwell Wirebound Box Co.*, No. L-79-117, 1980 WL 351421 at *3 (Ohio App. July 11, 1980) (holding that when a seller notified a buyer about "changing shipping dates, specifications prices and packaging . . . the [buyer] at that point should have exercised his rights under R.C. 1302.67(A) and asked for assurance of performance because there were reasonable grounds for insecurity."). While it might have been reasonable for Doral to demand assurance during August-November 2008, its demand in February 2009, after nearly four months of silence between the parties, served no useful purpose under Section 1302.67.

**Calculation of Damages**

Upon a buyer's repudiation of a contract for the sale of goods, a seller has several available remedies. *See* R.C. § 1302.77 (UCC § 2-703). Both parties focus on the remedy provided in Revised Code §1302.82(A):

> The measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in section 1302.84 of the Revised Code, but less expenses saved in consequence of the buyer's breach.

Both parties implicitly acknowledge that the "time and place for tender" in this case is the date on which the contract was cancelled. Gray urges a cancellation date of September 26, 2008 and

6

presents evidence of the market price of steel on that date (Doc. No. 26, p. 8); Doral argues the damages should be calculated as of March 2009, its favored date of repudiation (Doc. No. 27, p. 8).

The Purchase Order called for a July 2008 delivery, but that delivery date was later modified when Doral agreed to spread the steel shipments out over a longer time period. There is nothing in the record suggesting the parties reached a new agreement about a firm delivery date; rather, Gray would release shipments as needed. Thus, this Court agrees with the parties that the most sensible date from which to measure damages is the date of repudiation. As explained above, this Court concludes that Gray cancelled the contract at the end of October 2008.

An appropriate starting point for calculating the market price of steel is the CRU Monitor, which provides monthly base prices for hot dip galvanized steel in the Midwest regional market. The CRU Monitor, although numbered as Exhibit V, was not offered for admission at the hearing. Plaintiff later filed a request for judicial notice of the exhibit, which is titled CRU Monitor "steel sheet products prices supplement" from June 24, 2009 (Doc. No. 23). There was no prejudice to Defendant, and this Court granted the request for judicial notice (Doc. No. 25).

Testimony established that the steel ordered by Gray was a commodity (Tr. 44) and that the CRU Monitor is a standard publication widely used in the industry to determine base prices for steel (Tr. 56-57). Therefore, the CRU Monitor is the type of market price evidence contemplated by the UCC. *See* R.C. § 1397(D) (UCC § 2-724) ("Whenever the prevailing price or value of any good regularly bought and sold in any established commodity market is in issue, reports in official publications or trade journals . . . published as the reports of such market shall be admissible in evidence.").

The CRU reflects the steep decline in the steel market during 2008-09 (Ex. V):[2]

| Month | Base Price ($/lb) |
|---|---|
| August 2008 | 0.5825 |
| September 2008 | 0.5575 |
| October 2008 | 0.5050 |
| November 2008 | 0.3900 |
| December 2008 | 0.3175 |
| January 2009 | 0.3125 |
| February 2009 | 0.3000 |
| March 2009 | 0.2815 |

The CRU reveals dramatic price differences between October and November. The cancellation straddles those two months, and since there is no weekly monitor of steel prices (Doc. Nos. 29-30), a fair measure of market price at the end of October is the average of the published prices for October and November. Those prices are $0.5050/lb and $0.3900/lb, respectively, which average to $0.4475/lb. Therefore, this Court will use $0.4475/lb as the base price of steel.

In order to calculate the actual market price for steel, "extras" must be added to the base price listed in the CRU. Those "extras" reflect additional costs for cutting steel to a particular width, and for applying particular coatings. The steel that Gray refused to accept came in five different gauges and widths: .012x48, .012x41.24, .016x48, .016x60, and .019x60, and the "extras" vary accordingly. The following chart summarizes the "extras" information from Exhibit W and calculates the market price for each type of steel.[3]

---

[2] For ease of calculation, this Court will use price per pound. Some of the exhibits use price per hundred weight, or "CWT," meaning per hundred pounds.

[3] The gauges corresponding to the "extras" figures are taken from the "Minimal Thickness" column of Exhibit W (not the "Nominal Thickness" column) in accordance with the testimony of Michael Crooks (Tr. 74).

Exhibit W lists "extras" as of August 1, 2009. Although the width and thickness "extras" are generally constant in the market, the coating "extras" do fluctuate to some extent (Tr. 72-73). While Exhibit W is an imperfect guide to "extras" prices at the end of October 2008, it is the only such evidence before this Court (Doc. Nos. 29-30).

8

| Gauge/Width | Base Price ($/lb) | Width Extras ($/lb) | Coating Extras ($/lb) | Market Price ($/lb) |
|---|---|---|---|---|
| .012 x 48    | 0.4475 | 0.0900 | 0.0515 | 0.5890 |
| .012 x 41.25 | 0.4475 | 0.1100 | 0.0515 | 0.6090 |
| .016 x 48    | 0.4475 | 0.0700 | 0.0400 | 0.5575 |
| .016 x 60    | 0.4475 | 0.0700 | 0.0400 | 0.5575 |
| .019 x 60    | 0.4475 | 0.0400 | 0.0345 | 0.5220 |

The next step in the damages calculation is to subtract the market price (calculated above) from the contract price for each gauge of steel. The difference between the two prices is then multiplied by the quantity of undelivered steel for each respective gauge to yield the amount of damages. The total damages due Doral for breach of contract is $166,911.33 as summarized in the following table:

| Gauge/Width | Amount (lbs) | Contract Price ($/lb) | Market Price ($/lb) | Difference ($/lb) | Total ($) |
|---|---|---|---|---|---|
| .012 x 48    | 264,554.7 | 0.6695 | 0.5890 | 0.0805 | 21,296.65 |
| .012 x 41.25 | 661,368.8 | 0.6695 | 0.6090 | 0.0605 | 40,012.81 |
| .016 x 48    | 244,933.6 | 0.6395 | 0.5575 | 0.0820 | 20,084.56 |
| .016 x 60    |  99,208.0 | 0.7195 | 0.5575 | 0.1620 | 16,071.70 |
| .019 x 60    | 440,924.5 | 0.6795 | 0.5220 | 0.1575 | 69,445.61 |
|  |  |  |  | **Total** | **166,911.33** |

The parties agree that Doral is not entitled to incidental damages such as shipping costs (Doc. No. 26, p. 8; Doc. No. 27, p. 9).

Defendant offers an alternative measure of market price: individual sales of steel by Doral to other customers on September 25 and October 29, 2008 (Ex. M, N). However, given the volatile nature of the steel market at that time (Ex. V), the sale on September 25 -- more than a month before the contract was cancelled -- is not a reliable indicator of market price. The October 29 sale, by contrast, occurred near the date of cancellation and is thus a good indicator of market price. This Court will use that sale to test the industry-wide market price derived from the CRU. (Note: the

9

October 29 sale involved only one gauge and width of steel, not the range of five gauges and widths at issue in this case.) The October 29 sale price was $0.5995 per pound for .016 x 48 steel, reasonably similar to the price of $0.5575 calculated using the CRU. Thus, in the context of a steel market that dropped more than thirty cents per pound (over fifty percent) in seven months, the October 29 sale confirms that this Court's market price determination is realistic.

## CONCLUSION

Gray cancelled its contract with Doral in October-November 2008. Subtracting the market price at that time for the undelivered steel from the contract price yields the appropriate amount of damages under Revised Code § 1302.82 (UCC § 2-708). Gray is liable for damages to Doral in the amount of One-Hundred Sixty-Six Thousand, Nine-Hundred Eleven Dollars and Thirty-Three Cents ($166,911.33), plus pre-judgment interest from December 1, 2008 (allowing for thirty days after the October-November cancellation), and post-judgment interest.

IT IS SO ORDERED.

      s/ *Jack Zouhary*
      JACK ZOUHARY
      U. S. DISTRICT JUDGE

December 4, 2009